Good morning, Your Honor. Glenn McRoberts for Appellant James Kay. I wanted to emphasize a couple of points this morning, primarily the issue of the city's discretion in rendering its permit decision. And we talked about this in the Thompson case in particular. But the main point, and I think we've briefed it pretty well, but I just want to highlight it for a second, is that if the city, if it is a preempted area, the area of frequencies, radio frequencies, and the city had no option in that area, as the State Appellate Court ruled in the Abrams case on appeal, they referred to it as a preempted area. And so the city had no discretion. In that case, we have damages available under State law under 1095, California Civil Procedure, in regards to the writ of mandate being granted in our favor. And it also goes to the TCA argument, the Telecommunications Act argument, when they talk about whether or not you should have just the appropriate remedies. And the argument from the city's point of view was that under the – in this situation, because the usual remedies for permitting and land use decisions are injunctive relief, that those should be the appropriate remedies under the TCA, even though there are – there's nothing spelled out. And as we've noted in the Franklin Court and the Prime Co. case, they say the general rule is if we're – where nothing's spelled out, all the usual remedies apply. In this case, damages would apply, attorney's fees wouldn't. That's usually how this issue has come up when they've looked at it in 1983 and whether those attorney's fees and damages are available under that. Counsel, I'm looking at 47 U.S.C. Section 332. And the section there, I think you're looking at Section 5. Is that correct? Any person adversely affected by a final action? I thought it was 7, but it might – let me look at this a second. It's 7 and then B and then 5. Okay. Okay. So 7 is the – are you with me?  This is the section that you claim awards damages. Is that correct? Yes. Okay. Now, there isn't anything in there that discusses remedies, is there? No. Okay. And that provision applies to both State and local governments. Is that correct? That's my – that would be my understanding. Okay. So is your contention then that this section also would award damages against the State? Well, it would award damages against any local entity. Okay. But that's not my question. That says failure to act by a State or local government. Does this section then also make available damages against the State? Not in this case, but in a case in which the State was the actor. It's the same provision, counsel. It says State or local government. So if the damages are good against the local government, as you claim here, wouldn't they also be good against the State? Well, it's not something I've thought about, but I suppose. Okay. Then what do we do with the Eleventh Amendment? There's no waiver in here. Congress has not contemplated anything regarding damages against the State. How do we get damages against the local government? You can't get damages against the State here either. Well, I suppose we could draw that distinction, say the Eleventh Amendment protects the State. Well, do States typically engage in local zoning? No. But they do enforce Federal law, like the Telecommunications Act. And I think that's where we confuse the issue, is thinking that this is a typical zoning dispute. It's not. We filed our causes of action, and one of them was the violation of the Telecommunications Act in the context of the permit. It's sort of what it is, is basically if B follows A, in this case, if we go back to the facts of the case, A is if you have existing antennas and you want to broadcast on those on a given frequency, and you don't want to modify them or do anything to them, as was the case in Abrams and in Kay, then it follows B that you must be granted the permit. There's no discretion. Now, in between A and B, there's a permitting process that you still must go through. But as the Court in Abrams said, there are some cases where you might be required to grant the permit, although you're still you still have some discretion in terms of the conditions. And that certainly was the case in Kay. There were multiple conditions put on the granting of the permit. But I think that you get from A to B is there is no discretion. If you have A, you get B. And if there's no discretion, then I go back to, at the very least, the State law of 1095, you know, CCP 1095, does allow damages for acts that are normally discretionary but under the circumstances are not. If there's no discretion, what do you have to apply for a conditional use permit for to begin with? I mean, what's the purpose of a conditional use permit? If you can just go ahead and just get one because you asked for one, why do you need one? Well, we raised that at the State level. And they said that the City still has a right to regulate commercial activity in residential zones. If that's true, then doesn't that kill your argument? I mean, if they have some discretion somewhere along the line because they don't want people operating a commercial enterprise, forget that it's an antenna. You know, they don't want people operating a garage, a repair facility, or whatever it is. As long as there's some discretion, doesn't that insulate them from damages under State law? I don't think so. And, again, I think it's because if you look at the language in the Telecommunications Act, for example, where they say that it does put limitations, and I think that's one of the little lies that's in there someplace. But under that Act, it does say that there are limits on constructing, modifying, or otherwise doing something to erect a new facility if their main concern is about frequencies and about health concerns over frequencies. We're not interested in the frequencies. That's not our problem. We don't want a bunch of repair trucks coming in, or we don't want a lot of commercial traffic coming into the City. It's got nothing to do with frequencies. I mean, that's their concern. And if we allow a guy to operate a commercial antenna farm, then we have to let somebody else operate a commercial car repair place. Well, the distinction here is, of course, this is a passive operation, and we had existing antennas and existing repeater services. They were providing the same services. It's a repeater. You know, it receives the transmission. Yeah, that's what I'm saying. The problem is not the technological stuff. It's just they don't want a business operating there, whatever kind of business it is. Well, the situation here was that there was no distinction between the amateur operations and the business operations except for a change in frequency. I mean, the City doesn't even contest that it violated the Act, right? Pardon? The City didn't appeal. I mean, it doesn't contest that it violated the Act. No. I mean, so we're sitting here saying, okay, the City violated the Act by imposing the condition that you take down three antennas. Right. Okay? No question of that. So the question is whether what's your remedy, if any, for that violation? Right. And the remedy would be the damages Mr. Kaye suffered in the interim from not being able to use the FCC frequencies that he was allocated back in 98. Well, let me follow up on Judge Wardlaw's. I was going to say that's your question. They may have abused their discretion, but there still might be discretion. They may have been wrong in denying this, but isn't it still discretion? I don't think so. I think that goes back to the Thompson case where the certificate of occupancy was technically a permit that is a discretionary act or is called a discretionary act. But the Court determined that, well, once you've already authorized or okayed the facility, which in that case was a structure that had been renovated and they got the building permit and they came in and said the building's fine, but then they didn't let them proceed to have it occupied, and they withheld that. And the Court said, well, we don't care if they call that a permit or not. There's no discretion. Once they've made all the preliminary decisions, then the right to issue the certificate of occupancy, as I understand it, was a purely ministerial act. And the city had no right to withhold it once all the hearings and everything else, all the hoops had been jumped through. That would not be a discretionary act to withhold the last steps, like, you know, not giving you your diploma as you walk across the stage at graduation. At that point, the law school has no discretion to withhold the diploma. I'm sorry. I didn't catch the last part. Okay. But I think that's where it gets confusing is that we're trying to kind of cut up a little bit of where they have discretion and where they don't. And what I'm saying is that between A and B, if you're saying that, you know, B follows A, there's a hurdle, a procedural hurdle called a CUP, a conditional use permit. And the lower court, even in Abrams, said even if you have to grant the permit, because of the Telecommunications Act's provisions, that doesn't mean Mr. Abrams didn't still have to get it. He still has to go through that procedure because it's a business and technically he's got to get the permit to do the business. But they were preempted by Federal law from denying him that permit. They could put conditions on it. They could do, you know, whatever the reasonable conditions are, paint the antenna, put up some foliage, don't have a bunch of trucks in the driveway, whatever the conditions they might want to do. But they had no discretion to deny it. Once they said first, once they said you can have five antennas, they can't they don't have discretion to say you can't have five antennas simply because the frequency is going to be for commercial as opposed to amateur use. Right. For that reason. Right. They were preexisting, preapproved facility that was operating. Right. That you still go through the process because they might want you to do some other things. But the one thing they can't do at that point is tell you to take down five antennas. Right. And so that they had no discretion to do. And that's what they did. No, but why, okay, why not? I mean, I have some familiarity with the CUP process. And what is it about the process that once they say you can have these five antennas, they can't tell you that you can't have them? Is it once you've gone through the process and they've said you can have the five, they can change various conditions but they can't tell you to take down the five. What is it? Are they just bound by their prior decision? Well, I think it's just a logically flows from the Telecommunications Act and its purpose. If you look at the idea that even in cases where they're constructing, you know, I mean there are limitations on the construction or modification of radio facilities. And in some cases those courts in those cases have, you know, reversed and said, no, you have to give them the permit because, you know, that's just a small modification. If you have no modification at all and there is no difference to the neighbors, and that's the whole point, and both experts in this case even agreed. They said, well, technically nobody will be able to tell the difference. It's just a change in frequency. The city's mistake was to let your client have five to begin with. Arguably, yes. If they didn't want that to occur. They should have thought ahead. Right. The reason why I'm saying that, perhaps, if someone is going to put it at 510 is the reason probably isn't simply for amateur use. And the same thing with Abrams. He has a 52-foot tower on his property. And he had been he's in the exact same position. But in Abrams, they went for the gusto and went for the attorney's fees because typically in this situation, the damages and I hesitate to say this because if it goes back, I don't want to undercut my arguments. But the damages are probably considerably less than the attorney's fees in a situation like this for both. And it has. And speaking of that, that was a concern at the Supreme Court level, too, was the concern was over Verizon or somebody coming in and hiring Latham or Skadden or somebody from Melbourne and having them come in and bankrupting cities because if they lost, they would have to pay attorney's fees. And I realize they probably weren't considering policy considerations, but it seems to come up. But for the same reason, damages, in fact, some of Scalia's arguments can be used in favor of having damages under the Telecommunications Act because although it says you have to you have this procedure where you have 30 days to object and then you have an expedited review, our review took three years. I mean, there's nothing there's nothing that says there's no pressure on the local government to act expeditiously other than this, you know, Telecommunications Act that says you should. And what's the penalty if they don't? Well, they eventually lose and they have to grant the permit. And that's it. So there's nothing pushing them. And I. The nature of the damages that you would be seeking. Would be lost profits from and at the time he was his operations were shut down. He had two clients, a cement local cement company and another client that had the dispatcher sort of operation. So he would receive and repeat those signals so that they could get around the mountainous area of Palos Verdes. Back to the TCA to Section 332 C7B5 where we started. The language in that in that provision is is remarkably similar to language that's found in the Administrative Procedure Act, the Federal Administrative Procedure Act. But as I as if my memory is correct on this, the APA does not provide for any damage actions against Federal agencies. Why would Congress choose language that was similar to the APA and yet award damages under that? I don't know that one necessarily follows the other. I mean, the fact that there is a procedure that that is in place in the APA and that it's a they might decide what will follow that procedure. There's nothing in the act that says there's nothing in the act that says there are that we're going to follow them in terms of damages as well. If we've chosen language, it's very similar to the APA in which we have in which we have the availability of judicial review of agency action, which is what we were provided for here. This is judicial review of state and local agency action. And yet in the APA, we do not have a damages action against Federal agencies. Your claim is that we do have a damages action here against at least local agencies, perhaps not state agencies, because now you've given us an 11th Amendment carve out. I mean, that just seems like we're going to have to wrench some language here in order to find a damage action in the TCA. That may be. And I'm not sure how to resolve that, the conflicts you're talking about, except to say that the Congress didn't spell it out either in the TCA. And I go back to the Franklin case and the Franco case and Judge Posner and the Seventh Circuit and their analysis of whether or not damages are available when it is left unsaid. And I think the way it's come down so far is that Congress could have specified the remedy. Congress could have precluded a damage award if it had wanted to. Certainly. They could have done it either way. And that's what Franklin addresses and what Judge Posner and Franco addresses is, well, what do you do when Congress doesn't say anything? And they say, well, the unusual remedies, like attorney's fees, are not available, and usual remedies such as damages are. And that's, I think, the starting point. But in this case, I think we can find justice for Mr. Kaye on a much narrower issue if the Court's having trouble with the TCA. And that is the State 1095, the writ of mandate where damages are available when discretionary, otherwise discretionary acts are under the circumstances not discretionary. Can you sidestep this more difficult question and decide it narrowly under California State law? I would never suggest that the Court sidestep anything. I'm just suggesting an alternative way to get justice. Because if you look at it, this is a very narrow case, and I think the decision can be very narrowly tailored to these facts. These are the only two cases involving the TCA where you had existing antenna facilities that a city said, no, you can't change the frequency on them when there was no modification requested. And they're both with the City of Rancho Palos Verdes. And I suggest there's a reason for that. And I think it is an irrational, illogical decision that, under the circumstances, they had no discretion. I mean, they had the Abrams decision in front of them. They had ñ and this is not something that's going to pop up a lot. It's popped up twice, and it's been both in the same city. And I think that it's unfortunate Mr. Abrams didn't request damages under the State law, but we have. Is there any California case that upholds damages for denial of a conditional use permit? I would have to get back to you on that. I don't know offhand. My impression is there wasn't, that every time this or something like it comes up, the State's found immune or the City's found immune. Well, I think they have in cases where you're talking about typical zoning issues. If somebody's complaining about, well, the setback, you didn't apply it to this person, you applied it to me, and I shouldn't have been singled out. In typical zoning cases, yes. But, I mean, we do have this other layer, which is the Telecommunications Act. But still getting back to the Hobson case is a ñ is I guess the case, would be the case that we rely on that. Because that is ñ it's a permitting case. I don't know if it was conditional. It's not a conditional use permit. It was an occupancy certificate. Following somebody saying that the building was ñ renovations were sufficient. But it would be analogous, I think, to a permitting case. And this hasn't come up before. And I think it's because it is a rare circumstance. And I think it's rare because of the actions the City Council in this case took. They were out of the ordinary. Thank you very much, Mr. McRoberts. I just noticed I had a clock down here. Good morning, and may it please the Court. Peter Pierce appearing on behalf of the appellee, City of Rancho Palos Verdes. I'd like first to address the issue of damages under Section 1095 of the California Code of Civil Procedure going to the plaintiff's theory that somehow what the city has done here is regulate radio frequencies. And that is just not the case. A preparatory comment, Mr. Kaye has admitted in his briefing that the city had the discretion to impose all of the conditions that it did impose on the CUP, except for this condition that five of the original five antennas that had been approved for amateur use, that three of those be removed and two be left standing for commercial use. What's missing from Mr. McRoberts' analysis is the fact, well displayed in the record, that the city not only allowed Mr. Kaye to have the two rooftop antennas, but an unlimited number of antennas on the second floor of the residence. And as the record shows, this house has never been used as a residence. It has been used as a commercial antenna facility. That is not a disputed fact in the record since Mr. Kaye purchased the home. So Mr. Kaye could use whatever FCC-licensed frequencies he chose on the two rooftop antennas and on an unlimited number of interior antennas. Wait a second. Now you're arguing something that you specifically already agreed that, I mean, you're not arguing. You're arguing that it was okay that you didn't violate the TCA by ordering, the city didn't violate the TCA by ordering the takedown of the three antennas. No, Your Honor. I'm not arguing that at all. What I'm arguing is Mr. Kaye's position is that the city did not have discretion here because it was required to allow the five original antennas to remain for commercial purposes under the theory that if the city did not allow that, it would be regulating radio frequencies. And I'm rebutting that argument by saying the city did not regulate radio frequencies here at all because Mr. Kaye could have used any of his FCC-licensed frequencies on the two rooftop antennas and on an unlimited number of interior antennas. There is no evidence in the record that Mr. Kaye was precluded from using a particular FCC-licensed frequency on any antenna. And that is what distinguishes this case from the State Abrams case upon which Mr. Kaye so heavily relies. In the State Abrams case, the city denied a CUP. Mr. Abrams could not use any of his FCC-licensed frequencies at all. That is not the case here. The city simply is not regulating radio frequencies. So the city did not have a ministerial duty here to allow Mr. Kaye to use the five antennas that were originally perched upon the roof for commercial purposes. And so I think as Judge Silverman aptly noted, what the city did here was abuse its discretion, but it had discretion. And because it had discretion, it is immune from damages liability under State law. I'd like to move on, if I may, to the Telecommunications Act question. We are here confronted with a statute that is silent with respect to damages. And so what the Supreme Court has said we do in this type of instance is we have to divine congressional intent. Well, how do we do that? Well, there are two factors here which inform congressional intent. One is the state of the law as it existed at the time the act, the TCA, the Telecommunications Act, was adopted. And the second is the structure and purpose of the act. With respect to the law as it existed at the time the act was adopted, this statute is a rare Federal foray into an area traditionally preserved for regulation to State and local governments. There is a preservation clause, 332C7A, expressly preserves to State and local governments their traditional zoning authority except for the narrow carve-out of limitations in Subdivision B. And there is the saving clause which is mentioned in our brief in 601C. So as the Supreme Court did in the Oregon v. ACF case cited in our brief, it is appropriate for this Court to look to the common practice of the States in dealing with zoning decisions at the time the TCA was adopted to determine whether damages are available. And as we pointed out in our brief and in the supplemental excerpts of record, a great majority of States do not afford a damages remedy when a local agency has acted in violation of State law because substantial evidence doesn't support the decision. And that was the violation here. In fact, no State expressly provides for an award of damages in those circumstances. And 42 jurisdictions, 41 States and the District of Columbia expressly immunize States and localities for a damages award in those instances. So if we look to the laws that existed at the time the Act was adopted, it seems plain to me that Congress did not intend for damages to be awarded under the Telecommunications Act. Turning now to the structure and purpose of the Act, there are several aspects of the Act's structure which would seem to indicate that Congress did not intend for a damages award here. We look at the congressional record, the House conference report underlying the Act. The House conference report characterizes the action challenging the local agency's decision as an appeal, an appeal to the district court or to the superior court. You can bring action in State or local court. Appellate bodies do not award damages. Appellate bodies affirm. Or we're going to say bring an appeal. I'm saying, Your Honor, in the House conference report, the legislative history refers to the action that is allowed under Subdivision 5 as in the nature of an appeal. So my point there is that the Congress looked at the district court or the superior court, if it's brought in State court, is an appellate body reviewing the agency decision. And appellate bodies normally do not award damages. They affirm or reverse or modify or vacate and remand. That is one structural aspect of the Act indicating that Congress did not intend for an award of damages. We can also look to the command in the Act that the action has to be heard and decided on an expedited basis. Expedition is more consistent with hearing a lawsuit on a fixed record in a bench trial than it is to opening up the discovery process when you have a damages suit and hiring expert witnesses and having recipient witnesses on discovery and a jury trial, since there is a constitutional right to a jury trial when damages are awarded. That would be inconsistent with the command that the case be heard expeditiously. Also, I might add, there are two remarkable features in the structure of the Act that resemble State remedial regimes, the 30-day limitations period. A lawsuit challenging a local agency decision must be brought within 30 days, and we find that in almost all of the State remedial regimes. The longest limitations period I found was 90 days, and California has a 90-day limitation period. But this is indicative of congressional intent to emulate State remedial regimes which do not provide for an award of damages. Also, substantial evidence review provided for the Act is also telling because that is the same level of review that the States provide, further indicating that Congress was trying to emulate State remedial regimes. So the structure of the Act does not portend well for the argument that damages are available. Turning briefly to the purpose of the Act, the purpose of the Telecommunications Act was not to saddle municipalities with walking damages award. The Supreme Court recognized in the Abrams case this is a complex and novel statutory program that localities have to navigate. And Congress simply did not intend to slap municipalities with damages award. Rather, what Congress intended is expressly referenced in the legislative history, is to promote competition. So the price of telecommunications features and technologies to the end user would be reduced, and service would be increased, and to encourage the rapid deployment of technology. It has been suggested by Mr. Kaye that localities need damages awards as an incentive to comply with the Act. If Congress had intended that damages awards needed to be an incentive, surely it would have included and expressly stated that damages can be awarded here. In the Fair Housing Act, which provides for, which provides that an action may be compensatory damages are expressly provided for, but they are noticeably absent here. And Congress certainly would have said that damages can be awarded against a backdrop of a multitude of state laws which immunize municipalities from damages, particularly when those laws are preserved in the very Act itself. Unless the Court has any further questions, the City requests that the order dismissing the 9th through 11th claims on younger abstention grounds also be affirmed. Mr. Pierce, thank you very much. Mr. McRoberts, you really used up your time. We'll give you a minute and a half in rebuttal if you want it, and you don't have to take it if you don't. Just on the, I want to go back to the ID. The ID of how do we enforce or how does Congress enforce its expedited processing of these claims, given that ours is close to three years? I was looking at the dates. We filed for a cup in June of 2001, filed our case in May 2002, and the Court issued its order after trial in July of 2004. That's not even expedited for a normal case. And, again, there's no pressure on these local entities. There's no pressure on Rancho Palos Verdes, and I've done a lot of business in that with the City Council. And they just took their time, and there's no accountability. The damages in this case, whether it's 1095 or under the TCA, would provide at least some impetus or some incentive for the City Council to act in a reasonable manner and enforce federal law, which they didn't. I mean, I'm not sure what our remedy is if they would have taken four or five years, other than coming up with perhaps a writ of some sort to force them to decide it sooner. But the damages remedy works both ways, as they said in Posner, too. It works both ways. In fact, it's an expedited process. We'll keep the damages lower, sure. Thank you very much. Ms. McRobert, excuse me. Did you have a word on this? Not for you. I have one question for you. I was confused by something you said. You said that, and just correct me if I'm wrong, that the city did not impose these subsequent conditions of taking down the three antennas because of the commercial usage. Is that what you said? Your Honor, the city imposed the condition that Mr. Kaye remove those three antennas because he was going to make commercial use of those antennas. That is correct. And also because of, well, not solely because of that. That was in the nature of the application was for commercial use because of aesthetics and also a whole host of other factors. That's what I was going to ask you about, because that resolution, 2000- 227. 227, seems entirely based on the fact that the antennas were going to be used for commercial frequencies as opposed to amateur frequencies. Well, not that they would be used for, not the frequencies themselves are not what troubled the city, Your Honor. There was evidence in the record that Mr. Kaye was conducting a business out of his home. He never lived there, and he was making money on antennas. There was evidence in the record that money had changed hands, whether individuals were using those antennas to broadcast themselves, and the city was concerned that he was conducting a commercial enterprise. That's not what this resolution says. This talks about how you investigated and found out there were, that they were using commercial frequencies licenses as opposed to- And I think the resolution also refers to the fact that payments were made, Your Honor. That was in the record at the state court level. That is why the city originally brought the state court proceeding, because it found out that individuals were paying Mr. Kaye to use his antennas, and that is why it brought the lawsuit. The only way the city could detect those was by looking at the frequencies, but that was only a detection method. The city doesn't- I was just looking at this very narrow question of, you know, the question of whether the city had any discretion with respect to the five antennas on the roof. Yes, Your Honor, and one other comment to respond to that. The criteria that the city looked at when the original application came in for amateur use are much- they're not as strict as the criteria for commercial purposes, and that is because of federal regulation PRV-1, which is referred to in the record. Cities have to allow amateur use, and they cannot- they have to impose the least amount of restrictions under PRV-1 for amateur antenna use. Cities are allowed, with the exception of the prohibitions of the Telecommunications Act we're dealing with here, to regulate commercial use, and so there's a bit of a conundrum, which actually Judge Wilson, the district judge in the Abrams case, recognized that you might have an operator that wants to throw up an unlimited number of amateur antennas with the idea at the end that they would all be transformed to commercial use, and the operator could say, gotcha, city, because all you're doing is regulating frequencies. That's not the case. The city's trying to prohibit this grand commercial use in a residential zone, but the operator can take advantage of the lax laws governing amateur use to do it, and the district judge in this case actually found the city had reason to believe that what Mr. Kay's intentions were when he erected the five amateur antennas were originally to transform them to commercial use, and in fact, during the permitting process, Mr. Kay added another 11 antennas to his roof to try and shoehorn them in under the amateur regime, so all of a sudden he could say the city can't regulate commercial frequencies, so I'm allowed to have all of these antennas and operate my commercial enterprise at even more intense level in a residential zone. So the standards for amateur use and commercial use are different. Okay. You more than answered my question. Okay. Thank you so much. Gentlemen, thank you both. The case just argued is submitted. Good morning.
judges: Silverman, Wardlaw, Bybee